David R. Montlick
Alan Y. Saltzman°
Kathy Opperman°1

Jonathan B. Pierce
Orlando A. Marra *FL
Patrick R. Matarrese
Rory S. Chumley
Michael N. Rubin *MD
Lynn S. Walker
Michael J. Moran
Kimberly L. Jacobsen
Joel H. Roth *NY
Richard K. Warner *NY
D. Jeffrey Beaird *AL, TN
Jeffrey S. Kowalski
Christopher R. Ostolski
Ramon W. Palanca, Jr.
Margaret K. Grenleski
Nathan A. Kratzert
Jason A. Saltzman
Craig W. LaChanse

# MONTLICK & ASSOCIATES, P.C.

## ATTORNEYS AT LAW

17 EXECUTIVE PARK DRIVE • SUITE 300
ATLANTA, GEORGIA • 30329

TELEPHONE (404) 529-6333 • FACSIMILE (404) 321-3323
Montlick.com

Aaron N. Monick *CA, TN
Jennifer J. Fleming *NJ, PA
Alyssa A. Martins
Sara E. Root
Faris Zejnelovic
Sarah D. Neeland
Benjamin V. Copeland
Nora-Jane Roberts-Williams
Douglas J. Glosser
William A. Parker, Jr. * SC
Alexander J. Tertichny
Heather L. McPhillip
Michelle G. Mumpower
Nives R. Juric
Phillip Hairston
David B. Weinberg
Enrique A. Fernandez
Mark Anthony Molina *NY
Ellen E. Forrester *TN
Nicholas R. Vocino *AL
Joshua G. Davis
Ellis C. Liu

° Managing Attorney
1 also admitted in NY, NJ, & N.S.W.
* also admitted in other state(s)

February 11, 2021

**OVERNIGHT MAIL**
Ms. Kristyn Smith
Claims Management, Inc.
P.O. Box 14731
Lexington, KY 40512

RE:   <u>Glenda Darnell Norton v. Walmart Supercenter #855</u>
Our Client:      Glenda Darnell Norton
Your Insured:    Walmart
Your Claim No.:  L0282029
Date of Injury:  January 2, 2020

Dear Ms. Smith:

The following material, including receipts, medical reports, analyses, evaluations, and other documents, have been compiled to evaluate the liability of Walmart Supercenter #855, the nature of the injuries of Ms. Glenda Darnell Norton, and the extent of damages sustained by Ms. Norton as a result of the incident which occurred on or about January 2, 2020, caused by the negligence of Walmart Supercenter #855. Although we are sure you have had an opportunity to review the police report prepared in respect to this incident, we have enclosed a copy of the report labeled as <u>Exhibit "1"</u> for your review.

The following is being submitted to you for purposes of negotiation only. Your review of the same is under the conditions that nothing contained herein shall constitute an admission by our client and that nothing contained herein shall, by reason of the submission, be admissible against her at any hearing or trial.

All of the enclosed material shall remain the property of our client and shall be returned to her upon the request to you to do so.

202102170001171

Ms. Smith
Page 2

# **LIABILITY**

As you are aware, this office represents Glenda Darnell Norton for injuries she sustained in a premise's liability incident caused by your insured, Walmart. This is a clear liability incident in which Ms. Norton played no contributing role.

On January 2, 2020, at approximately 7:00 PM Ms. Norton and her adult daughter, Chalene Gossett, were patrons at the Walmart located on Jonesboro Road in the City of Union City, Georgia. They both turned left into an aisle that contained scented candles. **As they made their turn, their focus was directed to the left side of the aisle.** Ms. Norton took some candles that she intended to purchase off of the shelf and attempted to place them in her shopping cart, when suddenly and without warning, her legs went out from under her. Ms. Norton attempted to break her fall by grabbing her cart, but could not, and landed hard on the floor, sustaining serious injury to her lower back and shoulders. After Ms. Norton fell, she realized that she had fallen over spilled paint, which had rudimentarily been covered by paper towels (certainly not enough paper towels to properly cover the spill). Photos of the scene as it looked initially following the incident have been submitted for your review, labeled <u>Exhibit "A"</u>.

Immediately following the incident, Ms. Norton and her daughter began yelling the name of Ms. Norton's husband, Tony, who was in the store but not at the location of the incident. A female employee, approximately 30 years old 5'4 in height appeared at the scene, and brought a chair for Ms. Norton to sit in. Ultimately, an incident report was taken by Ms. Eva, an assistant manager.

The relevant law in Georgia that governs liability for an event such as this one is O.C.G.A. § 51-3-1, providing, in relevant part:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon its premises for any lawful purposes, he is liable for damages to such person or injuries caused by his failure to exercise ordinary care in keeping the premises . . . safe.

Furthermore, Georgia law also provides liability for employee negligence, also applicable here in O.C.G.A. § 51-2-2. This section provides, in relevant part:

> Every person shall be liable for torts committed by ... his servant by his command...and within the scope of his business, whether the same are committed by negligence or voluntarily.

In order to prove that Walmart was liable for this incident, we merely need to show that Walmart had notice of the hazard at issue. Georgia Courts have developed a test for constructive knowledge, which may be shown by:

> Demonstrating that (1) an employee of the defendant was in the immediate vicinity of the fall and had an opportunity to correct the hazardous condition prior to the fall, or (2) the hazardous condition had existed for a sufficient length of time that it would have been discovered and removed had the proprietor exercised reasonable

care in inspecting the premises. Kroger Co. v. Schoenhoff, 324 Ga.App. 619, 620-21 (2013) (citing Benefield v. Tominich, 308 Ga.App. 605, 608 (2011)).

The second method of establishing constructive knowledge can be satisfied if the Plaintiff shows evidence from which the jury can infer that a **reasonable inspection procedure was either not in place or was not followed, and the length of time that the hazard existed.** Id. at 621. Constructive knowledge may be inferred when evidence exists that the defendant lacked a reasonable inspection procedure. *Landrum v. Enmark Stations*, Inc. 310 Ga.App. 161, 163 (2011) (citing *Shepard v. Winn Dixie Stores, Inc.*, 241 Ga.App. 746, 748 (1999)).

**An invitee is not required "to look continuously for defects"** and has the right to assume that the occupier of the property took reasonable care to keep the premises safe and continues to do so. *Perkins et al. v. The Val D'Aosta Company*, 305 Ga.App. 126, 129-30 (2010) (citing Stephens v. Kroger Co., 236 Ga.App. 871, 873 (2010)).

When the injured party explains that she was not looking at the location of the hazard due to a distraction caused by, among others, one that "a defendant might have anticipated would divert the plaintiff's attention" or "the premises construction or configuration," then the plaintiff has presented enough evidence of the exercise of reasonable care for the matter to go to a jury. *Robinson v. Kroger Co.,* 268 Ga. 735, 746 (1997). See also Stephens vs. Kmart Corp., 336 Ga.App. 332 (2016) (Judgment for defendant premises owner reversed; factual issues remained whether the "drop off of the curb" was a defect which should have been plain and palpable to the plaintiff-shopper, who was distracted by defendant's racks of clothing hanging down the sidewalk.

Based on the law above, we want to make clear why we believe we can prove liability against your insured. First, we do not believe Walmart will be able to effectively prove that it had no notice of the paint spill that caused Ms. Norton's fall and subsequent injury. As stated above and seen in the photos, **the spill itself had already been covered with paper towels prior to Ms. Norton's incident.** As such, this indicates that *someone* (ostensibly a Walmart employee) had seen that there was a spill and attempted to cure the defect (temporarily), but did so poorly. Moreover, under the law, as mentioned above, there was at least another employee near the area where Ms. Norton fell as well who showed up at the scene simply from hearing Ms. Norton and her daughter calling for her husband.

Second, if it is Walmart's contention that Ms. Norton, a 65 year-old woman, should have seen the spill, we have evidence that this is not the case. As stated above, **Ms. Norton's daughter, Chalene Gossett, will testify that she was with her mother at the time of the fall, and did not see the spill prior to the incident. They were both focused on picking out candles.** Additionally, there were **no warnings or caution signs** of any kind, despite the fact that someone covered it with paper towels! You will also note from the photos that the aisle was relatively narrow, and the spill had already travelled into (and further than) the middle of the aisle.

In sum, according to the laws of the state of Georgia, Walmart is responsible for the control and maintenance of their property as well as liable for the negligence of its employees. Walmart and its employees failed to exercise ordinary care in failing to provide an environment where customers can walk about the store safely. No warnings were given to customers of this

Ms. Smith
Page 4

slippery substance.  Thus, *liability* on part of Walmart and its employees is unequivocal and clear.

## **INJURIES**

Immediately following the incident caused by your insured, Ms. Norton was rushed via ambulance to Piedmont Newnan where she complained to her attending physician of pain in both shoulders as well as her left knee and lower back.

After a full examination and a battery of tests, Ms. Norton was diagnosed with the following:

1. **Acute pain of both shoulders;**
2. **Left wrist sprain;**
3. **Contusion of left knee;**
4. **Acute right sided low back pain.**

Unfortunately, Ms. Norton's pain continued to persist, so she consulted with George Ballantyne, M.D., a Board-Certified Orthopedist, who conducted a full clinical examination of Ms. Norton and diagnosed her with the following:

1. **Acute pain of right shoulder;**
2. **Impingement syndrome of right shoulder;**
3. **Sprain of right rotator cuff capsule.**

As a result, she began a grueling but conservative course of physical therapy. Unfortunately, this therapy did not resolve her symptoms.  As such, an MRI of the right shoulder was ordered and read by Gilbert Mauls by, M.D., a Board-Certified Radiologist who found a partial thickness interstitial and bursal surface tear involving the anterodistal insertion for leading free edge insertion of the supraspinatus tendon at its attachment to the foot plate measuring 6 by 4 millimeters.

Due to these findings, Ms. Norton was recommended and endured a right shoulder arthroscopic surgery including **arthroscopic debridement, acromioplasty and endoscopic rotator cuff repair using an Arthrex anchor system (bone screws).**

A person's shoulder is made up of three bones: the upper arm bone (humerus), the  shoulder blade (scapula), and the collarbone (clavicle). The shoulder is a ball-and-socket joint: The ball, or head, of the upper arm bone fits into a shallow socket in your shoulder blade.

The arm is kept in the shoulder socket by the rotator cuff. The rotator cuff is a network of four muscles that come together as tendons to form a covering around the head of the humerus. The rotator cuff attaches the humerus to the shoulder blade and helps to lift and rotate the arm.

20210517000157271

02/17/2021

Ms. Smith
Page 5

There is also a lubricating sac called a bursa between the rotator cuff and the bone on top of the shoulder (acromion). The bursa allows the rotator cuff tendons to glide freely when a person moves the arm. When the rotator cuff tendons are injured or damaged, this bursa can also become inflamed and painful, which is what happened to Ms. Norton.



The surgical technique most commonly used to repair a rotator cuff tear is arthroscopy, the type of surgery that Ms. Norton endured.  During arthroscopy, the surgeon inserts a small camera, called an arthroscope, into the shoulder joint. The camera displays pictures on a television screen, and the surgeon uses these images to guide miniature surgical instruments.

In addition to the shoulder injury, Ms. Norton also suffered from lower back pain and required multiple rounds of radiofrequency ablation treatments after physical therapy failed to resolve her symptoms.

Radiofrequency ablation is a procedure using radio waves or electric current to generate sufficient heat to interrupt nerve conduction on a semi-permanent basis. The nerves are usually blocked for 6-9 months, although it may last as short as 3 months or as long at 18 months or longer.  The process must be repeated after the procedure outlives its effectiveness.

Radiofrequency ablation is most commonly offered to patients with neck or back pain from facet joint problems like arthritis or injury. For these patients, radiofrequency ablation is used to interrupt nerves that go directly to the individual facet joints. Most patients who undergo radiofrequency ablation have typically tried other, more conservative, treatments such as anti-inflammatory medication, chiropractic or physical therapy.

Radiofrequency ablation disrupts nerve conduction, specifically interrupting the conduction of pain signals. In turn, this may reduce pain, and other related symptoms. Approximately 70 percent of patients will get a good block of the intended nerve. This should help relieve that part of the pain that the blocked nerve controls. Sometimes after a nerve is blocked, it becomes clear that there is pain from the other areas as well.

Radiofrequency ablation is done in different positions depending on the nerves to be ablated. It is done either with the patient lying on the stomach when working on the facet joints, on the cervical or lumbar sympathetic nerves, and on spinal disks. It is performed occasionally on the back when ablation is in certain cervical or neck areas. The procedure is done under sterile conditions. The patients are monitored with EKG, blood pressure cuff and an oxygen-monitoring device. The skin on the back is cleaned with antiseptic solution and then the procedure is carried out. The skin is numbed with a local anesthetic. Then X-ray or fluoroscopy is used to guide placement of the introducer needles. Since nerves cannot actually be seen on x-ray, the introducer needles are positioned using bony landmarks that indicate where the nerves usually are located. Thus, the X-ray is used to identify those bony landmarks.

Once the introducer needle is in a good position by X-ray, a special electrically active needle tip is inserted. With this special needle tip in good position, electrical stimulation is done before any actual radiofrequency ablation. This electrical stimulation may produce a buzzing or tingling sensation or may feel like a deep ache or pain similar to the normal pain that the patient feels. Then a different type of electrical stimulation is used to make sure that no motor nerves are close by. When this type of stimulation occurs, you may feel some twitching or throbbing, but the physician is watching to make sure that no big muscle groups are being stimulated. You need to be awake enough during these parts of the procedure that you can report what you are feeling. If everything checks out okay, the tissue around the needle tip is numbed with local anesthetic. Then the tissues surrounding the special electrically active needle tip are then heated when electric current is passed through it. This effectively numbs or stuns the nerves semi-permanently. Once done, the needles are removed and bandages are applied.

Layers of muscle and soft tissues protect nerves. The procedure involves inserting an introducer needle or needles through skin and those layers of muscle and soft tissues, so there is some pain involved.

The risks and complications are dependent upon the sites that are ablated. Since the introducer needles have to go through skin and soft tissues, there will usually be some soreness and occasionally bruising. The nerves to be ablated may be near blood vessels or other nerves that can be potentially damaged. Electricity is also used during the procedure raising the possibility of an electrical burn. Great care is taken when placing the radiofrequency needles and using the electrical current, but sometimes complications occur.

Ms. Norton will testify that her life has been completely turned upside down because of the incident caused by your insured.  She has been unable to carry out housework, such as washing dishes, hanging and removing clothes, and even cooking.  In fact, Ms. Norton cannot bend down to pick up any heavy objects, or remove food from the over.  Her pain is so debilitating that she requires help turning on the lights in her home. Sadly, Ms. Norton  cannot lift her 18 month great granddaughter, or play with the other two (3 and 6). She has also become reliant on her daughter and her husband to help around the house on a regular basis.

Ms. Norton is an intelligent, pleasant, and family-oriented woman who will make a compelling witness on her own behalf in front of a local jury.

## DAMAGES

Glenda Darnell Norton incurred the following expenses as a direct result of the negligence of your insured:

| Medical Provider | Amount | Exhibit |
|---|---|---|
| Grady EMS | $ 2,333.68 | 1 |
| Piedmont Newnan Hospital | $ 5,130.96 | 2 |
| Coweta Emergency Group | $ 2,089.00 | 3 |

2021051700001571

Ms. Smith
Page 7

| | | |
|---|---|---|
| Piedmont South Imaging | $ 185.00 | 4 |
| Piedmont Physicians | $ 669.00 | 5 |
| Central Home Health Care | $ 4,298.02 | 6 |
| Georgia Bone & Joint | $20,725.00 | 7 |
| Century Anesthesia Management | $ 8,250.00 | 8 |
| Georgia Bone & Joint Surgery Center | $22,700.00 | 9 |
| **TOTAL MEDICAL BILLS TO DATE** | **$66,380.66** | |

### OFFER OF COMPROMISE

Considering the physical pain and suffering which Glenda Darnell Norton has endured, for settlement purposes only, we are willing to recommend that she accept the amount of THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000) in resolution of her claim. We feel this figure is a fair and reasonable amount to compensate Ms. Norton for her bodily injuries, medical expenses, disability, pain and suffering, mental anguish, and loss of the capacity for the enjoyment of life.

This demand letter is being sent to you for Glenda Darnell Norton's damages in a sincere effort to try to settle this matter short of costly litigation for all parties involved. Please contact me within thirty (30) days of receipt of this correspondence so that we can discuss this claim. Thank you in advance for your prompt attention.

Very truly yours,

MONTLICK & ASSOCIATES, P.C.

Jason A. Saltzman
Attorney at Law

LTR_126:687090:ndlsdb

Enclosures

02/17/2021